CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
August 25, 2025
LAURA A. AUSTIN, CLERK
BY: s/A. Beeson
     DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | |
|---|---|
| **TOMMY JAMES GRAHAM, JR.,** | ) |
| Plaintiff, | ) Case No. 7:24CV00096 |
| v. | ) **OPINION AND ORDER** |
| **J. ARTRIP, ET AL.,** | ) JUDGE JAMES P. JONES |
| Defendants. | ) |

*Tommy James Graham, Jr., Pro Se Plaintiff; Andrew R. Page,* OFFICE OF THE ATTORNEY GENERAL, CORRECTIONAL LITIGATION, *Richmond, Virginia, for Defendants Artrip, Thompson, and Boyd.*

The plaintiff, a Virginia inmate proceeding pro se, filed this civil rights action under 42 U.S.C. § 1983. He alleges that the defendant prison officials used excessive force against him, failed to prevent that use of force, or delayed his access to necessary medical care. Counsel has filed a Motion to Dismiss on behalf of Defendants J. Artrip, Thompson, and Boyd, and Graham has responded, making the motion ripe for decision. After reviewing the record, I conclude that the Motion to Dismiss must be granted in part and denied in part.

I. BACKGROUND.

I will state Graham's allegations about relevant events in the light most favorable to him as required by law at the dismissal motion stage. At the time

Graham's claims arose, he was confined at Wallens Ridge State Prison (Wallens Ridge).  Artrip was the prison's warden, Thompson was a lieutenant, J. Woods was a sergeant, Boyd was a unit manager, and T. Spears was a correctional officer.

On or about October 5, 2023, at approximately 8:45 a.m., Defendant Spears was working in the booth above three units of C-building.  Immediately after the cell doors opened for pod recreation, a fight ensued.  One inmate started attacking others with a knife.  Floor officers responded promptly and gave verbal commands for the inmates to stop fighting and get down on the ground.  Officers also deployed OC spray against the fighting inmates.  Once Graham was able to get away from the knife, the fighting ended.  He got down on the ground with his hands out as instructed, and the floor officers stopped spraying him.

As one officer moved away from Graham, Spears fired a rubber bullet from the booth above that hit Graham directly in his eye as he was lying on the ground.  After Graham was handcuffed, ready to be escorted to the medical unit. Spears told the officers to wait, and they instructed Graham to look up.  "Spears chuckled and said, 'Damn I got him good' referring to how [Graham's] eye had ballooned."  Compl. 6, ECF No. 1.[1]   Others later told Graham how Spears had boasted about his work, saying "if you don't get to your cell door [you're] going to end up like

---

[1] Page numbers cited to in the Complaint refer to the page numbers assigned by ECF.

Graham." *Id.* Graham asserts that as unit manager, Boyd, was responsible for the training of the officers in his building, including Spears, and should be held liable for Spears' actions.

Around 9:10 am, the prison doctor examined Graham and determined that he needed to go to a local hospital. Two transportation officers escorted him to Lonesome Pines Hospital, where a provider evaluated his face. Ultimately, however, it was determined that extent of Graham's injuries were too severe to be addressed there and he was referred for immediate transfer to a facial trauma unit at Carilion Hospital in Roanoke, four hours away.

At approximately 11:45 am, Graham's two transportation officers called Wallens Ridge on speaker phone to update their supervisors that Graham needed to go to a different hospital and that he would be transported immediately by ambulance. At about 11:55 am from the prison, Sergeant Woods and Lieutenant Thompson ordered the two transportation officers to "stall the transportation,"[2] "to convince the doctor that transport by ambulance was a bad idea," and to "keep [Graham] hidden in the hospital room until they kicked [them] out." *Id.* at 9.

---

[2] Oddly, the defendants' motion states that the transportation officers at the hospital talked to Woods and Boyd about Graham's condition and the need to transport him to another hospital for further care. Mem. Supp. Mot. Dismiss 2, ECF No. 20. I find no allegation in Graham's submissions suggesting that defendant Boyd had any involvement with the course of medical care for Graham that night.

The Lonesome Pines doctor returned to the room at approximately 12:10 pm and told the officers and Graham that the ambulance was ready, so Graham should use the bathroom before departure. The officers "asked the doctor to step out of the room to talk." *Id.* at 9–10. More than an hour later, the doctor returned to the room. Shocked to see that Graham was still there, he said, "Come on guys. He should've been on the road," and stormed out. *Id.* at 10. The officers called their supervisors again to update them about Graham's condition. Woods and Thompson allegedly heard from the officers that Graham's eye socket was broken, with one of the broken bones moving around, and that he was "in agony," complaining that the pain in his eye socket was "unbearable." *Id.* Woods and Thompson simply said repeatedly that Graham should not have been fighting. They ordered him "not to say anything to the nurse or doctor about the pain or [he] would have to sit in the van in the parking lot for a few hours." *Id.*

Graham did not arrive at Carilion Hospital until around 12:30 am, where he received pain medication and treatment. Graham was diagnosed with four broken bones in his eye socket, a cracked nasal bone, and impairment of his vision. He is experiencing severe headaches, has "problems breathing out [of his] nose," needs glasses, and has one "lazy eye." *Id.* at 11. The eye specialist allegedly said that if Graham had "gotten to them sooner," the doctor would have been able to prevent the injured eye "from becoming lazy." *Id.*

Before the October 5, 2023, incident, Graham and others had allegedly "filed grievances or otherwise notifications to defendant Artrip concerning the 'head hunting' ta[c]tics used by the gunmen" of Wallens Ridge. *Id.* at 7. Artrip allegedly "failed to take a corrective action" in response to these complaints. *Id.*

Graham brings this lawsuit under § 1983 against Artrip, Boyd, Thompson, Woods, and Spears. He seeks monetary damages from each defendant.[3]

## II. DISCUSSION.

### A. The Rule 12(b)(6) Standard of Review.

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of a complaint to determine whether the plaintiff has properly stated a claim, but "it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering a Rule 12(b)(6) motion, a court must accept all factual allegations in the operative complaint as true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

A complaint must plead facts sufficient to "state a claim to relief that is plausible on its face." *Id.* at 570. A facially plausible claim includes factual content

---

[3] Graham also seeks declaratory and injunctive relief, recognizing the defendants' alleged constitutional violations and directing them not to shoot anyone who is compliant with orders.

that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Graham is not represented by counsel. "[C]ourts are obligated to liberally construe pro se complaints, however inartfully pleaded." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 540 (4th Cir. 2017).[4]

### B. Defendants Artrip and Boyd.

Warden Artrip and Unit Manager Boyd argue that Graham fails to state facts showing their personal involvement in any violation of his constitutional rights. I agree.

Liberally construed, Graham's allegations against Artrip contend that before the October 5, 2023, incident, the warden failed to respond appropriately to grievances or other notices inmates had directed to him, complaining that gunmen at Wallens Ridge used unspecified tactics of "head hunting." Compl. 7, ECF No. 1. "[I]nmates have no constitutional entitlement or due process interest in access to a grievance procedure." *Booker*, 855 F.3d at 541. An inmate thus cannot bring a § 1983 claim alleging the ineffectiveness of an existing grievance procedure. In addition, an official's response or lack of response to an inmate's grievance or appeal cannot state a § 1983 claim, when no facts suggest that the official's action or

---

[4] I have omitted internal quotation marks, citations, and/or alterations here and throughout this Opinion and Order, unless otherwise noted.

omission caused or contributed to a constitutional violation. *Brown v. Va. Dep't of Corr.*, No. 6:07-CV-00033, 2009 WL 87459, at *13 (W.D. Va. Jan. 9, 2009). Graham does not state facts showing that Artrip received or read the head hunter grievances, or what action Artrip could have taken to prevent Graham's injury.

It seems Graham attempts to hold Artrip liable because he held a supervisory role over the gunmen. It is well established that supervisory or administrative officials cannot be held automatically liable under § 1983 for constitutional violations committed by their employees. Liability will lie only "where it is affirmatively shown that the official charged acted personally" in violation of plaintiff's rights." *Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017).

To state a claim of supervisory liability, a complaint must allege facts that demonstrate (1) that the supervisor knew his or her subordinate "was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury;" (2) that the supervisor's response showed "deliberate indifference to or tacit authorization of the alleged offensive practices;" and (3) that there was an "affirmative causal link" between the supervisor's inaction and the constitutional injury suffered by the plaintiff. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). Graham fails to make these showings as to Artrip. Graham's conclusory statements about past grievances do not support a finding that Artrip's alleged inaction in response somehow caused Spear's action or Graham's resulting injury. Therefore,

I conclude that Graham's Complaint fails to state any actionable § 1983 claim against Artrip. I will grant the Motion to Dismiss the claims against Artrip.

Graham's allegations against Boyd are similarly lacking. Graham does not allege that Boyd was personally involved in the shooting or in procuring medical care for Graham thereafter. Graham asserts only that Boyd, as unit manager, should be liable for Spears' actions, because Boyd was responsible for training his building officers. As discussed, Graham cannot hold Boyd automatically liable for Spears' actions based merely on Boyd's supervisory role. Moreover, Graham does not point to past instances when gunmen in Boyd's building had demonstrated a tendency to take actions posing risks of harm to inmates akin to the injury Graham suffered. Without such a pattern of risky subordinate behavior to put Boyd on notice of a need for specific, different training, Graham's supervisory liability claim against him fails. I will grant the Motion to Dismiss the claims against Boyd.

### C. Defendant Thompson.

"[S]ociety does not expect," nor does the Eighth Amendment require, that inmates have "unqualified access to health care." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). Rather, only "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain" that violates constitutional protections. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Thus, the prisoner plaintiff must show that, objectively, he was suffering from a serious medical need and,

subjectively, the prison staff (a) had "actual knowledge of the risk of harm to the inmate" arising from his medical need and (b) "recognized that his actions were insufficient to mitigate that risk." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).

Objectively, the inmate's medical condition must be serious, one that "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). Put another way, a medical condition is objectively serious if it "would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Id.* at 755.

> As the Supreme Court has made clear, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Rather, "to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* Not all medical delays, of course, will meet this standard. Medical care is often not immediate. Only the most fortunate are able to receive a doctor's appointment at the precise time they want it or medical attention at the very moment of arrival at a hospital. Waiting is often the name of the game. And actual treatment may not follow immediately upon medical attention, whether due to the caution of a prudent physician or the inevitable uncertainties of diagnosis. It would be wrong to turn the everyday inconveniences and frictions associated with seeking medical care into constitutional violations whenever they occur within the prison walls.
>
> Mere delay is therefore not enough. Rather, "[t]he objective prong requires [the plaintiff] to show that the alleged delay . . . put him at a 'substantial risk' of 'serious harm.'" *Moss v. Harwood*, 19 F.4th 614, 624 (4th Cir. 2021) (quoting *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016)). A commonplace medical delay such as that

> experienced in everyday life will only rarely suffice to constitute an Eighth Amendment violation, absent the unusual circumstances where the delay itself places the prisoner at "substantial risk of serious harm," such as where the prisoner's condition deteriorates markedly or the ailment is of an urgent nature.

*Moskos v. Hardee*, 24 F.4th 289, 297–98 (4th Cir. 2022).

> Deliberate indifference, the subjective facet of the analysis,
>
> is a higher standard for culpability than mere negligence or even civil recklessness, and as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference. To show an Eighth Amendment violation, it is not enough that an official *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction.

*Jackson*, 775 F.3d at 178. Furthermore, the official's action in response to the known risk must be reasonable. *Formica v. Aylor*, 739 F. App'x 745, 757 (4th Cir. 2018) (unpublished). "The necessary showing of deliberate indifference can be manifested by prison officials in responding to a prisoner's medical needs in various ways, including intentionally denying or delaying medical care, or intentionally interfering with prescribed medical care." *Id.* at 754.

The defendants argue that Graham's allegations are insufficient to support a claim that Thompson was involved with Graham's medical care at all. They claim Graham "does not state how he knows" Woods and Thompson were talking on the phone to the officers present with Graham at the hospital and that "[i]t is unlikely that both men were saying the same thing at the exact same time." Mem. Supp. Mot.

Dismiss 4, ECF No. 20. The defendants assert that "without further allegations regarding how he knew who those on the phone were, and what they specifically said as individuals," Graham fails to state a claim against Thompson. *Id.*

While Graham's allegations about Woods and Thompson are not a model of clarity, I conclude that he has alleged sufficient facts to support a reasonable inference that these defendants were deliberately indifferent to a delay of doctor-ordered, immediate, specialized medical treatment for him that night. These allegations satisfy the objective facet of the analysis.

Graham next alleges that the transport officers with him at the hospital spoke to Woods and Thompson as their supervisors on speaker phone, conveying these circumstances. Without elaboration, it is reasonable to infer that Graham could hear the officers on both ends of the line and knew from the conversation or voice recognition who the supervisors were. It is also not unreasonable to infer that Graham heard the supervisors confer and agree in a decision to direct the transport officers to "stall" the ambulance trip, to convince the doctor not to require it, or to conceal Graham or take other action to delay the trip. Compl. 9, ECF No. 1. With the doctor allegedly urging haste, the transport officers allegedly followed the supervisors' directions and delayed Graham's access to care.

During a second update phone call, the officers allegedly told the supervisors specifics about Graham's condition and pain, only to have Woods and Thompson

order Graham not to complain to the medical staff about pain under threat of even more delay. Again, it is not unreasonable to infer that this second call occurred over speaker phone with Woods and Thompson talking together directly to Graham. Taken in the light most favorable to Graham, these allegations support a reasonable inferences that Woods and Thompson (a) knew of the severity of Graham's facial injuries and pain, (b) knew of the doctor's medical judgment that Graham needed prompt and specialized care, and (c) yet acted to delay that care for hours, knowing that their actions would leave Graham in severe pain. Furthermore, Graham alleges that he can produce facts showing how the delay in treatment adversely affected his caregivers' ability to alleviate his pain and save his quality of vision. Based on this construction of Graham's allegations against these defendants, I will deny the Motion to Dismiss the claims against Thompson.

### III. Conclusion.

For the reasons stated, it is hereby **ORDERED** as follows:

1. The Motion to Dismiss, ECF No. 19, is GRANTED IN PART AND DENIED IN PART. The motion is granted as to all claims against Artrip and Boyd, and the Clerk shall terminate these individuals as parties to this action. The motion is denied as to the claims against Thompson for deliberate indifference to Graham's serious medical need for prompt treatment elsewhere.

2. Defendants Thompson, Woods, and Spears are DIRECTED to file an Answer and any summary judgment motion within thirty days from the entry date of this Opinion and Order. If no such motion is filed within that time, I will set the matter for trial in the Abingdon Division of this court.

3. The Clerk shall mail a copy of this Opinion and Order to defendant Woods at the address where he was served, as indicated on Page 2 of the executed Summons, ECF No. 24.

ENTER: August 25, 2025

/s/ JAMES P. JONES
Senior United States District Judge