IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

April 09, 2026

LAURA A. AUSTIN, CLERK
BY: s/J.Vasquez
DEPUTY CLERK

**TOMMY JAMES GRAHAM, JR.,**
     Plaintiff,

v.                            Case No. 7:24-cv-00096

**THOMPSON, Lieutenant, et al.,**
     Defendants.

## MEMORANDUM OPINION

Tommy James Graham, Jr., ("Graham"), a Virginia inmate proceeding pro se, has filed this civil rights action under 42 U.S.C. § 1983, alleging that the defendant prison officials used excessive force against him or were deliberately indifferent to his medical needs. By Opinion and Order entered August 25, 2025, the court dismissed certain defendants. (Docket Item No. 56.) The remaining defendants, T. Spears, Lt. Thompson and Sgt. J. Wood, have since filed a Motion for Summary Judgment, (Docket Item No. 79) ("Motion"). Graham has filed a response, making the Motion ripe for consideration. Upon review, the Motion must be granted, in part, and denied, in part, for the following reasons.

I.

On October 5, 2023, at approximately 8:45 a.m., Graham was involved in a fight with several inmates at Wallens Ridge State Prison, ("Wallens Ridge"). According to Graham's Complaint,[1] (Docket Item No. 1), when cell doors opened for pod recreation, one of the inmates came out of his cell attacking him and others

---

[1] Graham's Complaint was made under penalty of perjury. In addition, Graham has filed three affidavits from other inmates. This is the entirety of the evidence from Graham that may be considered in response to the Motion. Graham, himself, has not offered an affidavit, and his response to the Motion, (Docket Item No. 86), is not sworn.

with a knife.  Initially, only one officer was working on the floor, and defendant T. Spears, ("Spears"), was working as a gun post officer in the pod control booth.  The floor officer attempted to break up the fight by spraying the inmates with OC spray, to no avail.  Other officers responded, also spraying the inmates with OC spray.  The inmates continued to fight, and Spears fired non-lethal blunt impact projectile, (BIP), rounds.  Finally, the inmates stopped fighting and complied with orders to lie on the ground to be restrained and removed.

Graham contends that, as he was lying down with his hands out as instructed, Spears fired one more shot that hit him directly in the eye.  In support of his response to the defendants' Motion, (Docket Item No. 86) ("Response"), Graham provides an affidavit of Lafayette D. Joyner, ("Joyner"), another inmate involved in the altercation.  Joyner declared, "I saw when he laid down and I also saw when the bullet hit him in the face . . . I swear to god [Graham] was laying down when the police shot him in the face."[2]  (Docket Item No. 89 at 1.)  Graham also filed an affidavit from Antonio Smith, ("Smith"), (Docket Item No. 28-1 at 1), which states:

> … The [correctional officers] in the pod had things under control, everyone was laying down with their hands out.  I was a few feet away from Tommy Graham, I heard the shot, but saw the impact when it hit Tommy Graham in his face and a puff of green smoke appeared around him as he was already laying down with his hands out, there was no reason for that shot.

Graham further asserts that Spears later taunted, "damn, I got him good." (Docket Item No. 1 at 6.)  Graham filed an additional affidavit from Smith, (Docket Item No. 89 at 2-3), which states in pertinent part:

> … I … was waiting … in order to speak to the nurse when[] … Spears pointed his gun … menacing due to the very tip of my shoe being out

---

[2] Notably, Joyner states that the bullet ricocheted from Graham to the floor officer's leg, hurting her.  However, incident reports submitted by officers following the event reported that no staff injuries occurred.

the red line, and yelled "back your ass up before you end up like Graham."

As a result of the incident, Graham claims he had four broken bones in his eye socket, a cracked nasal bone and permanent vision impairment. Graham was evaluated by a prison medical official and, shortly thereafter, transported to Lonesome Pine Hospital by two transportation officers, who are not named as defendants in this lawsuit. Graham claims that after the physician at Lonesome Pine determined that he needed further evaluation and should be transferred to Carilion Roanoke Memorial Hospital, ("Carilion"), he overheard Wood, the transportation sergeant, and Thompson, the transportation supervisor, order the transportation officers to "stall the transportation" while they were talking on speaker phone. (Docket Item No. 1 at 9.) Graham states that he did not arrive at Carilion until 12:30 a.m. and, once assessed, the eye specialist told him that had they arrived sooner, his eye would have been prevented from becoming lazy. In his response to the Motion, Graham further asserts that the physician told him that, due to the delay in his arrival, a blood clot formed and that surgery would be complicated; therefore, Graham elected not to have surgery.

The defendants describe a different version of events. The defendants deny that Spears shot Graham with the projectile and insist that no BIP rounds were fired once the inmates stopped fighting. In support of their position, the defendants have submitted affidavits from Intelligence Officer D. Harris, ("Harris"), and defendants Spears, Wood and Thompson, incident reports and surveillance video footage of the pod recreation area during the inmate altercation. Spears, in his affidavit, (Docket Item No. 90), explains that, after giving verbal warnings to the inmates to stop fighting, he fired a 40mm OC round, which did not hit any inmates. Because the inmates continued fighting, and it became apparent that a weapon was involved,

Spears transitioned to a BIP round.  He states that he aimed at the inmates' lower extremities and issued six total BIP rounds, with verbal warnings between rounds. "Following the sixth round, the inmates finally complied with orders and stopped fighting." (Docket Item No. 90 at 3.)  Spears further denies taunting Graham or any other inmates involved.  Finally, Spears asserts that he "was not deliberately trying to injure Graham or any other inmate.  Rather, [he] fired the non-lethal projectile rounds towards the inmates who were actively fighting, in an attempt to stop the ongoing altercation." (Docket Item No. 90 at 4.)

The surveillance video footage submitted is consistent with this narrative.  In support of their Motion, the defendants have filed four video recordings from the C-6 pod surveillance cameras from the morning of October 5, 2023, which the court has placed under seal.  (Docket Item Nos. 80, 81.)  Only three of these recordings show the incident in question.  The incident reports filed by the defendants state that Graham was housed in cell C-607 at the time of the incident.  The court's review of these video recordings reveals that, at approximately 8:51 a.m., several cell doors were opened and, as soon as Graham and his cellmate exited their cell, they were rushed by another inmate and a fight occurred.  The fight lasted a total of 33 seconds. While inmates were fighting, it appears that the floor officer and other responding officers sprayed OC spray on the inmates in an effort to break up the fight.  The video evidence shows at least five small clouds of smoke near the fighting inmates. According to Harris's affidavit, each of these clouds of smoke occurred when one of Spears's BIP rounds landed.  (Docket Item No. 80-1 at 2.)  It is clear from the recordings that none of these clouds of smoke appear after all of the inmates have stopped fighting.

The defendants also deny any subsequent interference or intentional delay with Graham's medical treatment.  In furtherance of this position, the defendants submitted affidavits of Wood and Thompson, as well as Graham's medical records,

4

which track a timeline of events.  At 9:05 a.m., Graham was evaluated by a nurse in the prison's medical department.  (Docket Item No. 80-7.)  Graham was then transported to Lonesome Pine Hospital and triaged in the emergency room at 12:15 p.m.  (Docket Item No. 80-8 at 16.)  He was assessed by a physician at 12:28 p.m. (Docket Item No. 80-8 at 16.)  At 2:36 p.m., the physician noted that Graham would be transferred to Carilion. (Docket Item No. 80-8 at 18.)  The Transfer Authorization Form was signed by a registered nurse at 2:39 p.m.  (Docket Item No. 80-8 at 28.) According to an incident report, Graham was transported to Carilion at approximately 5:20 p.m.  (Docket Item No. 80-6.)  Graham was triaged in the Carilion emergency department at 9:39 p.m.  (Docket Item No. 80-8 at 13.)  He was then evaluated by a physician at 9:54 p.m.  (Docket Item No. 80-8 at 12.)  Finally, he was discharged at 12:26 a.m.  (Docket Item No. 80-8 at 13.)

> The Carilion physician notes provide as follows:

> 39-year-old male presents after right eye injury.  Difficult to fully evaluate the eye due to swelling.  Outside imaging reviewed from earlier in the day at the outside hospital.  This showed medial orbital wall fracture as well as orbital floor fracture. Consulted facial trauma as well [as] ophthalmology who evaluated patient in the emergency department.  Sinus precautions and follow-up according to facial trauma. Ophthalmology will follow-up patient as well.  No indication for emergent surgical intervention per either service.  I discussed all this with patient as well as the officers in the room with him.  Discharged back with officers and follow-up information was given to patient. Strict return precautions given.

(Docket Item No. 80-8 at 13.)  Graham was discharged with prescriptions for Norco, Zofran and Augmentin.  (Docket Item No. 80-8 at 13.)

Regarding Graham's allegations that defendants Thompson and Wood interfered with his timely treatment and caused delay, Thompson and Wood do not recall talking to the transportation officers as Graham suggests.  Specifically, Thompson states in his affidavit,

> I have no recollection of talking to the transporting officers while they were at the hospital with Graham.  While it is normal to have some delays at the hospital waiting for the inmate to be seen by the doctor and the processing of paperwork, I have no knowledge that Graham's treatment was intentionally delayed by security staff.  I personally took no action to prevent Graham from receiving necessary medical treatment and I have no reason to believe that any other Wallens Ridge staff acted to delay or "stall" Graham's medical care or his transport to Roanoke, Virginia, for specialized medical care.  Roanoke is approximately 3 hours from Wallens Ridge.

(Docket Item No. 80-3 at 2–3.)  Similarly, Wood states in his affidavit, "I do not recall having any telephone conversations with the transporting officers regarding Graham or his care after they left the facility for Lonesome Pine Hospital," and "[a]t no time did I interfere with the medical providers' decisions concerning Graham's medical treatment, nor did I attempt to stall or delay his transportation to a specialist." (Docket Item No. 80-4 at 2.)

## II.

The court should grant summary judgment only when the pleadings, responses to discovery and the record reveal that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(a).  A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When ruling on a motion for summary judgment, "[t]he court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party." *Shaw v. Foreman*, 59 F.4th 121, 129 (4th Cir. 2023).  The court "may not weigh the evidence or make credibility determinations." *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019) (citation omitted).  At the same time, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should

6

not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

To avoid summary judgment, a party must set forth "specific facts showing that there is a genuine [factual] issue for trial" on which the jury could find in his favor. *Shaw*, 59 F.4th at 129 (citation omitted). Thus, the court's summary judgment inquiry is whether the evidence, taken in the light most favorable to the nonmoving party, "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014) (citation omitted).

A pro se litigant's verified complaint or other verified submissions must be considered as affidavits and may defeat a motion for summary judgment "when the allegations contained therein are based on personal knowledge." *Goodman v. Diggs*, 986 F.3d 493, 498 (4th Cir. 2021). Where a pro se plaintiff fails to respond to a defendant's specific evidence contradicting the allegations of the Complaint, that defendant may be entitled to summary judgment. *See Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 875 (4th Cir. 1992).

### III.

Graham has presented his claims in this case under § 1983, a statute that permits an aggrieved party to file a civil action against a person for actions taken under color of state law that violated his constitutional rights. *See Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013). He has alleged that defendant Spears violated his constitutional rights by using excessive force against him, and defendants Thompson and Wood exhibited deliberate indifference to his medical needs. Both claims fall under the Constitution's Eighth Amendment prohibition of the infliction of cruel and unusual punishments and will be addressed in turn.

### A.

Under the Eighth Amendment, prisoners have a right to be free from the "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319, 320 (1986) (quoting *Ingram v. Wright*, 430 U.S. 651, 670 (1977)). To establish a violation of this right in order to maintain a claim that excessive force was used by a prison official, an inmate must satisfy both an objective and subjective component. *See Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996).

Under the objective component, it must be shown that the harm inflicted was sufficiently serious. *See Williams*, 77 F.3d at 761. However, the extent of the injury is only one factor to consider because even "de minimus injury, if the product of malicious and sadistic use of force, can sustain the claim." *Parker v. Stevenson*, 625 F. App'x 196, 198 (4th Cir. 2015) (citing *Wilkins v. Gaddy*, 599 U.S. 34, 37–38 (2010)). Rather, "the nature of the force," is the relevant inquiry. *Parker*, 625 F. App'x at 199 (quoting *Hill v. Crum*, 727 F.3d 312, 321 (4th Cir, 2013)).

Thus, the excessive force analysis rests in the subjective component, which requires asking whether the prison official acted with a sufficiently culpable state of mind. *See Williams*, 77 F.3d at 761. "[T]he 'core judicial inquiry' regarding the subjective component of an excessive force claim is 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Iko v. Shreve*, 535 F.3d 225, 239 (4th Cir. 2008) (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)). This requires consideration of four nonexclusive factors:

> (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) any efforts made to temper the severity of a forceful response.

*Iko*, 535 F.3d at 239 (quoting *Whitley*, 475 U.S. at 321).

Here, the parties' dispute lies in the timing of the shots Spears fired and whether that amounted to malicious or sadistic use of force or a good faith effort to restore discipline. Graham argues that he already was lying on the ground, compliant with orders, when Spears fired a BIP that struck him directly in the face. If it were true that Graham no longer was fighting and complying with orders, it would negate the need for the application of force at that point. On the other hand, however, the defendants argue that Spears acted pursuant to his duty to take reasonable measures to protect prisoners from violence at the hands of other prisoners by firing the BIP rounds in order to stop the ongoing fight between the inmates and that the last shot was fired before the fight ended.

The defendants rely on surveillance video footage submitted to the court and reviewed by Graham, (Docket Item No. 43), to support their contention that Spears did not fire projectiles once the inmates stopped fighting and were compliant with orders. Indeed, the surveillance footage demonstrates such. According to Harris's uncontested affidavit, the BIP rounds Spears fired were seen on the video footage as small clouds of smoke when they landed. These clouds of smoke appear in the video recordings only while the inmates continue to fight. Thus, the video makes clear that Spears acted to restore discipline after the fight erupted, and it is evident that no shots were fired once the inmates stopped fighting. Although Graham submitted two affidavits from prisoners involved in the altercation to bolster his position that he was lying down when Spears shot him in the face, these accounts are inconsistent with the video evidence. As the Supreme Court has explained, where a plaintiff's version of events is so "utterly discredited" by unchallenged video footage that no reasonable jury could believe him, summary judgment is appropriate. *Scott*, 550 U.S at 380; *Iko*, 535 F.3d at 230 ("[W]here . . . the record contains an unchallenged videotape capturing the events in question, we must only credit the plaintiff's version of the facts to the extent it is not contradicted by the videotape."). Accordingly, as

9

to Graham's excessive force claim against Spears, Spears is entitled to summary judgment.

## B.

Also constituting cruel and unusual punishment under the Eighth Amendment is a prison official's deliberate indifference to an inmate's serious medical needs. *See Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "The necessary showing of deliberate indifference can be manifested by prison officials in responding to a prisoner's medical needs in various ways, including intentionally denying or delaying medical care, or intentionally interfering with prescribed medical care." *Formica v. Aylor*, 739 F. App'x 745, 754 (4th Cir. 2018) (citing *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976)). To make a deliberate indifference claim, a plaintiff must, likewise, satisfy objective and subjective elements.

First, the plaintiff must demonstrate that he had an objectively serious medical need. *See Iko*, 535 F.3d at 241. An objectively serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241 (citation omitted). Furthermore, "'where a deliberate indifference claim is predicated on a delay in medical care,' there is no cognizable constitutional claim 'unless the delay results in some substantial harm to the patient.'" *Monchery v. Dryden*, No. 7:23-cv-00461, 2025 WL 2842399, at *9 (W.D. Va. Oct. 7, 2025) (quoting *Formica*, 739 F. App'x at 755).

The second element, which involves a defendant's subjective awareness of the medical needs, requires a showing that the defendant acted with a "sufficiently culpable state of mind." *Mays v. Sprinkle*, 992 F.3d 295, 300 (4th Cir. 2021) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *See Jackson*, 775 F.3d at 178 (citing *Farmer*, 511 U.S. at 837).

10

The court previously determined that Graham alleged sufficient facts to support a reasonable inference that the defendants were deliberately indifferent to a delay of doctor-ordered, immediate, specialized medical treatment, allowing his claims to survive a motion to dismiss. (Docket Item No. 56 at 9–11.) At the summary judgment phase, the question becomes whether the defendants have shown that there is no genuine dispute as to any material fact and they are entitled to judgment as a matter of law.

Under the objective prong, the defendants concede, for purposes of this Motion, that Graham had a serious medical condition necessitating treatment by a physician. However, the parties dispute the defendants' role in delaying Graham's transport in order to receive appropriate medical care. While the defendants state that Thompson and Wood had "no role," (Docket Item No. 80 at 18), Graham insists that they had a "major role." (Docket Item No. 86 at 13.) Upon review of the record, there is a question of material fact regarding whether the asserted delay caused substantial risk of serious harm under the objective part of the inquiry. As the Fourth Circuit has explained, ordinarily, "[m]ere delay … is not enough" to amount to a constitutional violation, particularly where "[m]edical care is often not immediate." *Moskos v. Hardee*, 24 F.4th 289, 297–98 (4th Cir. 2022). Therefore, "absent the unusual circumstances where the delay itself places the prisoner at 'substantial risk of serious harm,' such as where the prisoner's condition deteriorates markedly or the ailment is of an urgent nature," a medical delay will "rarely suffice to constitute an Eighth Amendment violation." *Moskos*, 24 F.4th at 298.

The defendants argue that there is no evidence that any delay in transport caused him to suffer substantial harm. The defendants point to the Carilion physician's notes, which indicate that they did not schedule Graham for surgery or any additional medical treatment; rather, they released him with pain and anti-nausea medication. Graham, on the other hand, asserts that he was not scheduled for surgery

11

because the physician advised him that, due to the delay in his arrival at Carilion, he developed a blood clot which would complicate surgery; therefore, Graham elected not to undergo surgery for his own safety. He maintains that if he had arrived earlier, he would not have suffered long-term visual impairment. The question resides in this alleged discussion between Graham and the physician at Carilion. While the defendants are correct that the physician's notes state that Graham would not be scheduled for surgery, they further state, "I discussed all this with patient as well as the officers in the room with him." (Docket Item No. 80-8 at 13.) The defendants do not address the discussion that Graham has posited regarding alleged complications that surgery may have implicated, and it is unclear from the record whether a delay was the cause of any potential surgical complications or long-term effects on Graham's vision.

Furthermore, under the subjective prong, there is a question of fact regarding the defendants' state of mind and whether they knew of and disregarded an excessive risk to Graham's health or safety. The defendants state that they have no recollection of advising the transportation officers to delay Graham's transport to receive timely medical care, whereas, Graham emphasizes that, although the defendants may not recall speaking to the transportation officers on the phone, he personally heard Thompson and Wood direct them to stall the transportation while they were talking on speaker phone. This is "a classic contest of credibility between plaintiff and defendant," and "precisely the sort of question we delegate to juries." *Moskos*, 24 F.4th at 297. Therefore, whether Thompson and Wood intentionally interfered with and delayed Graham's medical care is a question of material fact reserved for trial.

Accordingly, as to Graham's deliberate indifference claim against Thompson and Wood, the defendants' Motion must be denied.

12

IV.

In conclusion, the defendants' Motion for Summary Judgment, (Docket Item No. 79), will be granted, in part, and denied, in part.  A jury trial will be scheduled on the remaining deliberate indifference claim against defendants Thompson and Wood.

An appropriate Order will be entered with this Memorandum Opinion, and the Clerk will send a copy of this Memorandum Opinion and the accompanying Order to all counsel of record and unrepresented parties.

**ENTERED:** April 9, 2026.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE

13